**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,                    Case No.: 0:20-cr-00244-PAM-KMM

              Plaintiff,

v.                                                          **REPORT AND**
                                                              **RECOMMENDATION**

Tayrel Lamar Rulford,

              Defendant.

---

This matter is before the Court on Defendant Tayrel Lamar Rulford's Motion to Suppress Eyewitness Identifications. (ECF No. 31). The Court held a hearing on June 1, 2021. The hearing included the testimony of former Brooklyn Center Police Department Officer Eric Wick, who was involved in Mr. Rulford's arrest and the subsequent eyewitness identifications, and numerous exhibits were introduced into evidence. Mr. Rulford asks the Court to suppress four separate "show-up" eyewitness identifications as unduly suggestive and unreliable in contravention of his due process rights. For the following reasons, the Court recommends that Mr. Rulford's motion be denied.

## I.    Background[1]

The facts are, for the most part, undisputed. On the night of July 21, 2020, at about 9:30 p.m., Brooklyn Center Police Department officers standing in the parking lot outside their station heard what sounded like a nearby gunshot. (Hr'g Tr. 5, 6, ECF No. 51). One of those officers, Eric Wick, saw a car had just "peeled off." (Hr'g Tr. 6). He and his partner, Officer Lund,[2] pursued, believing it may have been involved in a shooting. They soon pulled over the car about a block away at a gas station on the corner of 69th Avenue North and Humboldt Avenue North. (Hr'g Tr. 6–7; Gov't Ex. 6a at 0:22–1:00). Both officers drew their weapons on the car's two occupants and ordered the driver out of his car. (Gov't Ex. 6a at 0:45–3:02). Soon the officers realized the occupants were the victims of the gunshot rather than the aggressors and transitioned to interviewing them. (*See* Gov't Ex. 6a at 2:10).

### Statements of L.M. and L.W.

Officer Lund questioned the driver and identified him as L.M. (Gov't Ex. 6a at 12:24). Officer Lund's initial conversation with L.M. was not submitted as evidence.

---

[1]    In making these factual findings, the Court relies heavily upon video produced by police body-worn cameras which capture the views of three different officers over the course of the evening in question. To help establish an accurate chronology of events across locations and to give greater context to the show-up identifications, the Court matched radio communications to synchronize the videos. Gov't Ex. 6a is about 43 seconds ahead of Gov't Ex. 6f, and Gov't Ex. 6d is about 18 second ahead of Gov't Ex. 6a (or 1:01 ahead of 6f). In other words, a 0:00 timestamp on Ex. 6f is at the same time as a 0:43 timestamp on 6a and 1:01 timestamp on 6d.

[2]    Gov't Ex. 6a at 1:00:33 (Officer Wick calling his partner "Lund").

Meanwhile, Officer Wick approached the passenger door and began questioning the other occupant, soon identified as L.W. (Gov't Ex. 6a at 3:00).

Both L.M. and L.W. gave Officers Wick and Lund a similar description of events prior to them being pulled over. Earlier that night, they encountered a man while at a "Pump N Munch" convenience store across the street from where they were pulled over. L.M. either mistook the man for someone else, or the man approached them on his own and asked for a ride, which L.M. refused.[3] In either case, the other man became upset, and L.M. had a short argument or discussion with him. L.M. and L.W. then drove to a nearby apartment building about a block away. Moments after parking, the same man approached their car and shot at them—the shot heard by nearby officers. The witnesses quickly drove away before being stopped by Officer Wick. (*See* Gov't Ex. 6a 3:05–25:28; Hr'g Tr. 10).

Officer Wick later obtained video from a security camera at the Pump N Munch. (Hr'g Tr. 20; *see also* Gov't Ex. 6a at 1:13:20–1:12:10 (showing Officer Wick asking for video before being called to Mr. Rulford's arrest)). The security camera video was submitted as Gov't Ex. 6g, and shows L.M. pulling into the gas station with L.W. in the passenger seat. A man walks towards the driver door, stopping near the left taillight. L.M.

---

[3]    Mr. Rulford and the government dispute the interpretation of one statement by L.W., where she said, "he made a mistake, he thought he was somebody else," while gesturing in the direction of both L.M. and the Pump N Munch across the street. (Gov't Ex. 6a at 9:02). Mr. Rulford takes this to be her saying L.M. mistook the man at the Pump N Munch for someone else, and the government generally disputes this interpretation. (Def. Br. at 4; Gov't Br. at 20 n.2). L.M. later told officers the suspect approached and asked for a ride. (Gov't Ex. 6a at 23:28; *see also* Hr'g Tr. 10 ("[the suspect] approached [L.M.], asked for a ride"); Gov't Ex. 6a at 59:57 (Officers Wick and Lund telling Sgt. Soliday the witnesses described the suspect asking for a ride)). This is a distinction without a difference for the purpose of the pending motion.

gets out of the car and stands just outside the door while talking to the person for about a minute. L.M. then walks around the car towards the Pump N Munch, as does the man. L.M. finally returns to the car and drives away. (Gov't Ex. 6g). The person talking to L.M. is a black male wearing lightblue pants with holes near the knees, white shoes, a black sweatshirt with distinctive, non-symmetrical white styling on the sleeves, and a white head covering underneath his hood. (*Id.*).

After Officer Wick first approached L.W., but before she provided any details about the shooter, a suspect description was loudly broadcasted over Officer Wick's radio, describing "a black male with a white shirt and jeans." (Gov't Ex. 6a at 3:32). Officer Wick asked L.W. if that sounded familiar, and she agreed. (*Id.*).

After asking L.W. several more questions about her personal information, Officer Wick returned to his partner and L.M., who were still by the squad car. (Gov't Ex. 6a at 5:55). L.M. then described the shooter as a black man wearing a white t-shirt, a white tie around his head, and face tattoos, pointing near his left cheek as he described the tattoo. (Gov't Ex. 6a at 6:28–7:03). Officers Wick and Lund repeatedly asked L.M. if the man was wearing a white beanie and was on a bicycle, seemingly in response to a previous sighting of a suspect on a bicycle and L.M.'s vague descriptions of something white wrapped around the suspect's hair or head. (*See* Gov't Ex. 6f at 2:33 (L.M.'s somewhat vague description of headwear); Hr'g Tr. 35 (Officer Wick testifying there had been reports of the suspect riding a bicycle)). After Officer Lund broadcasted L.M.'s description, L.M. clarified that the face tattoo was the letters "TC," and not a teardrop tattoo. (Gov't Ex. 6a at 7:56–8:07).

Officer Wick then returned to L.W., who had not moved from the front passenger seat of the car. (Gov't Ex. 6a at 8:21). L.W. described the man as wearing jeans, a white t-shirt, a zip-up jacket, and a hat. (Gov't Ex. 6a at 9:36–10:01). She was unable to remember details about the jeans or hat. (*Id.*). Officer Wick also noted a bullet hole in the left side of the car above the gas tank, but L.W. was not certain if it was from that night. (Gov't Ex. 6a at 10:33, 8:26).

The officers had L.M. and L.W. sit in the back of the squad car. (Gov't Ex. 6a at 11:21). Officer Wick joined them, working on the car's computer while talking to L.M. and recalling a time he had given L.M. a ride. (Gov't Ex. 6a at 12:04, 12:25). About five minutes later, Officer Wick left the car. (Gov't Ex. 6a at 17:34). He talked with his partner, including discussing a man he knew with a "TC" tattoo on his face, Johnny Bergen,[4] but also commented Mr. Bergen did not fit the size description. (Gov't Ex. 6a at 18:08). Officer Wick's partner noted they should wait to question the witnesses, saying, "you don't ask too many questions when you've got them next to each other." (Gov't Ex. 6a at 18:34). Although Mr. Rulford contends the witnesses could have talked during this brief period alone in the back of the squad car, the car's backseat video shows they did not. (Gov't Ex. 6c at 17:37–18:57).

Officer Wick then had each witness individually step out of the car so that he could get a recorded statement while the other remained in the backseat. (Gov't Ex. 6a at 18:56). L.W. went first and again described the events leading up to the shooting. She then gave

---

[4]    The exact spelling of Mr. Bergen's last name is unconfirmed.

another suspect description, saying he was approximately Officer Wick's height and wearing baggy clothing, including an opened, zippered sweatshirt, white t-shirt, a beanie style hat, dreads, and pants. (Gov't Ex. 6a at 19:26–22:20). L.M. did the same, first discussing the encounter at the Pump N Munch and subsequent shooting. He too then gave another description, saying the man had dreads with his hair tied, and a TC tattoo. L.M. again pointed to his left cheek when describing the tattoo. When Officer Wick asked to confirm if it was on the suspect's right cheek, L.M. stopped, then pointed to his other cheek and said, "I think on the right." He also clarified that he had never seen the person before. (Gov't Ex. 6a at 22:55–25:15).

While finishing L.M.'s statement, another call played over Officer Wick's radio, saying they had received a report from a nearby residence that a "tall black male with dreads and a white shirt was in the backyard." (Gov't Ex. 6a at 24:22). Still talking to L.M., Officer Wick said, "That's him. I think we might have him." (Gov't Ex. 6a at 24:29). When L.M. asked, "Ya'll got him?" Officer Wick said, "I think we might, yeah. Yeah that's him." L.M. followed up, again asking, "You got him?" and Officer Wick responded, "Yeah, well or, he's, or close," and soon after concluded the recorded statement. (Gov't Ex. 6a at 24:39).

Officer Wick then placed L.M. back into the squad car, where he remained with L.W. for the next hour. (Gov't Ex. 6c at 25:31–1:34:00). During this time, they were driven to the police station, (Gov't Ex. 6c at 57:45), asked follow-up questions by other officers, (*id.* at 1:02:15 (asking about a bike, which both witnesses denied ever seeing), 1:06:49 (asking how old the suspect looked), 1:30:07 (telling them an arrest was made and they

will be asked to identify him)), and both generally remained silent the entire time, (*but see id.* at 27:02 (L.M. briefly talking to L.W. without much response)).

While the witnesses waited in the back of the police car, Officer Wick stood outside the gas station with Officer Lund. (Gov't Ex. 6a at 25:40–57:50). When Officer Lund asked Officer Wick if both L.M.'s and L.W.'s stories were the same, Officer Wick said, "Yeah, pretty much," but that L.W. seemed "pretty out of it." (Gov't Ex. 6a at 52:00). Officer Wick also complained that L.M.'s description was inconsistent, as L.M. first told him the suspect was on a bike, then later told another officer there was no bike. (Gov't Ex. 6a at 1:07:34; *see also id.* at 6:29 (Officer Wick asking L.M. if the suspect was on a bike); *and* Gov't Ex. 6c at 1:02:15 (L.M. telling another officer there was no bike)). Mr. Rulford also claims L.M.'s description was internally inconsistent for the same reasons. (Def. Br. at 3, ECF No. 44).[5]

### Statements of I.P. and H.R.

While Officer Wick and his partner interviewed L.M. and L.W., other officers responded to the shot-fired call, creating a perimeter and beginning an "all-out manhunt," including the use of about 20 police cars and a helicopter. (Hr'g Tr. 36, 50). Among them was Sergeant Soliday, whose body camera video was submitted as Gov't Ex. 6f. At the beginning of his video, Sgt. Soliday is heard talking to several witnesses. They soon point

---

[5]     Mr. Rulford argues that in fact L.M. described the man as being on a bike. (Def. Br. at 3). However, the Court's careful review of the cited portion of the bodycam video (Gov't Ex. 6a at 6:29–7:20) does not confirm that L.M in fact mentioned a bicycle, though admittedly the audio is difficult to hear. It is unnecessary for the Court to resolve whether the officer in fact ever heard L.M. mention a bike, because L.M. later definitively advises the officers that the man was never on a bicycle. (Gov't Ex. 6c at 1:02:15).

out a suspect on a bicycle and shout, "He's right there!"[6] Sgt. Soliday pursued the suspect, but quickly lost him. (Gov't Ex. 6f at 0:30–2:41). He returned to the original area and began directing other officers to set up a perimeter. (Gov't Ex. 6f at 4:30).

Almost forty minutes later, two witnesses approached Sgt. Soliday. (Gov't Ex. 6f at 39:47). He later identified them as I.P. and H.R.,[7] and recognized them as two of the witnesses he had spoken to previously. (Gov't Ex. 6f at 42:40, 43:46). They talked to him for just a few seconds before he walked back to his car. (Gov't Ex. 6f at 39:54–40:18). Because he had muted body camera audio at the time, there is no record of what they said. However, he returned to them less than a minute later, this time with his audio resumed. (Gov't Ex. 6f at 41:41). Building on one another's descriptions, I.P. and H.R. described the person they had seen before as being a tall black male with dreads, wearing a white hoodie[8] and black shirt, with a white shirt underneath that they saw after they watched him take off his outer shirt. (Gov't Ex. 6f at 41:53).

They also explained how they had interacted with this person earlier. He approached their car, knocked on the window, and told them someone had robbed him. He asked for a ride, which they declined, and as they drove away they saw him take off his black outer shirt and abandon it in a nearby bush, which I.P. pointed out to Sgt. Soliday. (Gov't Ex. 6f

---

[6]    Sgt. Soliday's subsequent radio broadcast is possibly the cause of Officer Wick's repeated questions to L.M. and L.W. about whether the suspect was on a bicycle.

[7]    Mr. Rulford's brief refers to the same person as "Mr. Canongo." (*See generally* Def. Br.).

[8]    When H.R. describes the suspect as wearing a "white hoodie" he gestures over his head as if indicating a hat. (Gov't Ex. 6f at 41:57).

at 42:12–42:20, 44:42–45:03). Police later found a black sweatshirt and gun where I.P. had indicated. (Gov't Ex. 6f at 1:24:36 (recovering the gun), and 1:18:38 (recovering the sweatshirt); *see also* Gov't Ex. 7 (the recovered sweatshirt, bearing similar arm stylings to the one seen in the Pump N Munch security video)).

### Arrest

Mr. Rulford's arrest was captured by Officer Casey's body-worn camera (Gov't Exs. 6d and 6e). About an hour and twenty minutes after the first police response, police found Mr. Rulford in a parking lot. (Gov't Ex. 6d at 1:22:37). He was wearing a white t-shirt, light blue jeans, and a blue bandana around his neck. (*See, e.g.,* Gov't Ex. 6d at 1:22:53). Immediately after arriving, they placed him under arrest. (Gov't Ex. 6d at 1:22:54). Officers Wick and Casey both expressed confidence that Mr. Rulford was the man they had been looking for. (Gov't Ex. 6d at 1:23:05). Not long after, police placed Mr. Rulford—who had remained calm and cooperative—in the back of Officer Casey's squad car. (Gov't Ex. 6d at 1:25:05). Once in the back, however, he quickly became antagonistic towards police officers and demanded to immediately be taken to jail. (*See* Gov't Ex. 6d at 1:26:45-1:29:59).

### Show-up identifications

While Mr. Rulford remained with other officers, Officer Wick drove each of the four witnesses, one at a time, to the parking lot to identify Mr. Rulford. The witnesses were instructed not to talk to one another. This was Officer Wick's first time facilitating a show-up identification, and he testified that he had not received specific training on the procedure but had learned from watching others. (Hr'g Tr. 38–39, 40).

The show-up identifications were captured by several different cameras, including Officer Wick's body-worn camera (Gov't Exs. 6a and 6b), the backseat camera of the car Officer Wick used to transport witnesses (Gov't Ex. 6c), and Officer Casey's body-worn camera (Gov't Exs. 6d and 6e). The backseat camera of Officer Wick's car and his body-worn camera provide audio and video of each witness being read show-up instructions as well as their confirmation on the scene. The backseat camera generally provides the clearest audio of the witnesses' answers. Officer Casey's body-worn camera provides the best view of the general setting of the show-ups.

Prior to the show-ups, Officer Wick read each of the witnesses the "showup card." (Gov't Ex. 6c at 1:36:41 (L.M.); 2:00:28 (L.W.); 2:16:05 (I.P.); 2:24:52 (H.R.)). The card reads:

> You are going to be asked to view some people. The suspect in this case may or may not be one of the people you are about to view. It is just as important to clear innocent persons from suspicion as it is to identify the guilty. Regardless of whether or not you identify the individuals, we will continue to investigate this incident. If you identify someone, I will ask you to state in your own words, how certain you are. Do you have any questions?

(Gov't Ex. 2). After reading each witness the card, he drove them to the lot and parked, facing the police car Mr. Rulford was being held next to, about 20-30 feet away. (Hr'g Tr. 32). Officer Wick testified that several other police cars were visible on the drive to the parking lot. (Hr'g Tr. 45). Each witness would then look out from the back seat through the front window and determine whether or not Mr. Rulford was the suspect they had seen earlier. (*See, e.g.*, Gov't Ex. 6c at 1:56:05).

When Officer Wick arrived with L.M. at the parking lot, Mr. Rulford was still in the back of the police car, the overhead emergency lights on the car were flashing, and another two to four officers were standing near the car. (*See* Gov't Ex. 6d at 1:40:08 (showing Officer Wick's car in the background while Mr. Rulford is still in the backseat of Officer Casey's car with visible flashing lights)). Officer Casey eventually turned off the overhead lights during L.M.'s show-up. (Gov't Ex. 6d at 1:53:40). Other than Officer Wick's car, there was only one other police car in the lot. (*See generally* Gov't Ex. 6d after 1:32:15, 6e). The parking lot was lit mainly from one bright floodlight on the neighboring building. (*See, e.g.,* Gov't Ex. 6d at 1:41:25). Officers also used flashlights and car lights to light Mr. Rulford's face at various times during the identifications. (*E.g.,* Gov't Ex. 6d at 1:57:38; Gov't Ex. 6e at 28:25).

When officers first tried to conduct the show-up, Mr. Rulford initially refused to exit the back seat of the car. (Gov't Ex. 6d at 1:39:50). After waiting several minutes, L.M.—who had been voluntarily confined to the backseat of a police car for close to an hour and a half—indicated that he urgently needed to use the restroom. Officer Wick allowed him to leave the car to do so, and L.M. returned to the backseat less than a minute later. (Gov't Ex. 6c at 1:41:40-1:42:24). L.M. was the only witness to leave the car at the parking lot. While he and Officer Wick continued to wait for Mr. Rulford to exit the backseat of Officer Casey's car, paramedics arrived to check on Mr. Rulford, per his previous request to be evaluated. (Gov't Ex. 6d at 1:53:54). Police eventually helped Mr. Rulford from the car, who voluntarily exited once the paramedics told him they were there to look at him. (Gov't Ex. 6d at 1:56:04). However, Mr. Rulford soon became

uncooperative again and started yelling about police brutality and how they were hurting him.[9] (Gov't Ex. 6d at 1:57:15). After he refused to stay standing, the officers had him sit on the ground, where he remained for the remainder of the show-ups. (Gov't Ex. 6d at 1:58:03).

While the paramedics were examining Mr. Rulford, L.M. was able to make his identification. Generally, he indicated confidence that it was the same person he had seen earlier at the gas station and who had shot at his car. He articulated that he was sure because of the matching dreads, tattoo, and the distinctive pants. (Gov't Ex. 6c at 1:56:09–1:57:14). Mr. Rulford can be heard yelling in background towards the end of the identification. (Gov't Ex. 6c at 1:57:09). Officer Wick and L.M. left the scene about a minute later, concluding L.M.'s involvement for the night. (Gov't Ex. 6c at 1:58:26).

The remaining show-ups went much more smoothly. During L.W.'s identification, Mr. Rulford was already seated on the ground, the overhead emergency lights were off, and Mr. Rulford had stopped yelling. (*See* Gov't Ex. 6e at 3:01–8:47). The lighting and conditions were otherwise the same as before, and there were still four officers and two paramedics near Mr. Rulford. (Gov't Ex. 6e at 3:05).

In making her identification, L.W. said, "it looks like him," and she was "pretty certain" or "90%" sure it was the same person. She mentioned his facial structure and his hair as standing out to her, and remembering a distinguishing mark on his face, referencing

---

[9]     The body-worn camera footage shows officers using minimal force on Mr. Rulford, including discussing alternative means of conducting the identifications rather than physically forcing him from the backseat. At no point did they appear to cause injury, and the paramedics found no recent injuries. (*See* Gov't Ex. 6e after 1:22:54).

his tattoo. After she asked, "Does he have something on his face, is that what's on his cheek?" and Officer Wick told her there is a small tattoo, she expressed certainty it was the same person. (Gov't Ex. 6c at 2:02:44–2:03:46).

The lighting and conditions were the same for I.P.'s identification, but the paramedics had left and only three officers remained, excluding Officer Wick. (*See* Gov't Ex. 6e at 20:10–20:20). Immediately after arriving at the parking lot, before the car even stopped, I.P. said, "yep that's him." She said his white shirt and dreadlocks made her "100%" sure it was the same person. When Officer Wick asked again if there was anything specific that made her sure, she repeated that the white shirt and dreadlocks were definitive for her. (Gov't Ex. 6c at 2:19:03–2:19:45).

By the time of H.R.'s identification, there were only two officers left with Mr. Rulford. (*See* Gov't Ex. 6e at 27:45–28:48). Much like I.P., H.R. identified Mr. Rulford before the car came to a stop, saying, "yep, that's the guy." H.R. was not able to identify any specific features or details that confirmed it was the same person other than the white shirt, but he was otherwise certain it was the person he had seen earlier. (Gov't Ex. 6c at 2:27:35–2:28:30).

## II.    Analysis

An eyewitness identification should be suppressed as a due process violation where "improper police conduct created a 'substantial likelihood of misidentification.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012)). This requires a two-part analysis.

First, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39. This finding of "impermissible suggestiveness" is prerequisite to further analysis, but is not by itself a basis for suppression. *Id.* at 249 (Thomas, J., concurring) ("The Court correctly concludes that its precedents establish a due process right to the pretrial exclusion of an unreliable eyewitness identification only if the identification results from police suggestion."); *Id.* at 250 (Sotomayor, J., dissenting) ("The Court today announces that that rule does not even 'come into play' unless the suggestive circumstances are improperly 'police-arranged.'"); *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Next, after finding impermissible suggestion by police, "courts [must] assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239. The "[r]eliability of the eyewitness identification is the linchpin of that evaluation," and the "indicators of a witness' ability to make an accurate identification"— as identified by *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)—are weighed against the "corrupting effect of law enforcement suggestion." *Perry*, 565 U.S. at 239 (cleaned up) (citing *Brathwaite*, 432 U.S. at 114, 116). This remains a high bar, which the Supreme Court has found satisfied only once in *Foster v. California*, 394 U.S. 440 (1969), and the weight of the evidence may still be decided by the jury.

Against the backdrop of this legal framework, the Court finds that the introduction of the identification procedures described above at Mr. Rulford's trial would not violate his due process rights and recommends that the Motion to Suppress be denied.

### A. Impermissible Suggestiveness

The first issue is whether the identification of Mr. Rulford by the four witnesses was "impermissibly suggestive." To be impermissibly suggestive, the procedure must have been both suggestive and unnecessary.

The Eighth Circuit and Supreme Court have held that "show-ups are inherently suggestive." *United States v. Hadley*, 671 F.2d 1112, 1115 (8th Cir. 1982) (citing *Pratt v. Parratt*, 615 F.2d 486, 488 (8th Cir. 1980), *cert. denied*, 449 U.S. 852 (1980)); *see also Stovall v. Denno*, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *Simmons v. United States*, 390 U.S. 377, 383 (1968) ("[The danger of misidentification] will be increased if the police display to the witness only the picture of a single individual."); *United States v. Henderson*, 719 F.2d 934, 937 (8th Cir. 1984) ("showups are 'the most suggestive, and therefore the most objectionable method of pretrial identification.'"); *Brathwaite*, 432 U.S. at 109 (agreeing with petitioner's statement that "the procedure in the instant case was suggestive (because only one photograph was used).").

There is no question that Mr. Rulford's show-up identifications were suggestive. Police presented him, and only him, to each witness. Without anything more, this itself is a suggestive practice, especially when compared to less prejudicial procedures such as lineups or photo arrays. And the circumstances here were even more suggestive than those necessarily inherent in a routine one-person identification: Mr. Rulford was handcuffed, accompanied by two to four police officers, with lights shining on him, sitting on the

ground directly outside a police vehicle, and had just been the alleged subject of an all-out manhunt fully observed by each of the witnesses. Furthermore, Officer Wick had previously told one of the witnesses, L.M., that they had found the suspect, saying "that's him," and had asked L.W. to confirm someone else's description before she ever gave her own. Mr. Rulford could be heard yelling that the police were hurting him during at least one identification, witnesses passed multiple police cars on the way to the identification, and at least two witnesses relied heavily on Mr. Rulford's non-unique tattoo to identify him. Most, if not all, of these suggestive factors could have been avoided by having witnesses participate in a line-up or observe a photospread.

Based on these facts and the guidance from the Supreme Court and Eighth Circuit, there can be no question that the procedure used in this case was suggestive. *Stovall*, 388 U.S. at 302; *Hadley*, 671 F.2d at 1115. The Court gives little weight to the government's contention that the police effectively minimized the suggestiveness. (Gov't Br. at 14, ECF No. 55). Although each witness made the identification separately, was properly instructed using the "show-up card," and was largely kept from conferring with other witnesses, these actions by no means overcame the inherent suggestiveness of the show-up procedure used and the surrounding circumstances in this case.

The Court should also consider whether it was necessary to conduct a show-up identification rather than a less suggestive procedure. The Supreme Court has found an identification using only single photograph, while clearly suggestive, to also have been unnecessary, as there was no emergency or exigent circumstances precluding a less-suggestive approach. *Brathwaite*, 432 U.S. at 109 ("Petitioner at the outset acknowledges

that the procedure in the instance case was … unnecessary (because there was no emergency or exigent circumstance)."). Here, the government argues for the necessity of both the show-up itself and additional arrest procedures such as handcuffing and seating Mr. Rulford. (Gov't Mem. at 14–18).

In a strict *Brathwaite* analysis, it was arguably entirely unnecessary to perform an on-the-spot identification of Mr. Rulford. First, there was no emergency. *See Stovall*, 388 U.S. at 302 (finding emergency circumstances creating necessity when the only surviving witness was hospitalized and was not certain to live). All the witnesses would likely have been available to attend a line-up or view an organized photospread at a future time, even as soon as the next day. Officers had the contact information of all four witnesses including phone numbers and addresses, and none presented any indication they would soon be unavailable. Neither was there exigency, as officers had already caught a suspect and expressed strong belief that he was the right person. *See Simmons*, 390 U.S. at 384-85 (finding exigent circumstances creating necessity when FBI agents used suggestive family photographs to identify dangerous suspects who were still on the run).

Candidly, the Eighth Circuit's more recent rulings somewhat blur the line of what constitutes "necessity" in assessing the admissibility of suggestive identification procedures. *Compare, e.g.*, *United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) (finding a show-up of an accused bank robber outside the bank while handcuffed and accompanied by police was not impermissibly suggestive because "necessary incidents of on-the-scene identifications, such as the suspect being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive."), *with Stovall*, 388

U.S. at 302 (finding necessity when the only eyewitness was uncertain to live long enough to attend a trial); *Hadley*, 671 F.2d 1112, 1115 (8th Cir. 1982) ("[S]how-ups are inherently suggestive and ordinarily cannot be condoned when a line-up procedure is readily available."); *and Sanchell v. Parratt*, 530 F.2d 286, 294 (8th Cir. 1976) ("[T]he police did not need to resort to the one-man showups used. There was no emergency as in *Stovall*. After the photographic display, the police could have asked the persons whose pictures had been selected to participate in a fair lineup…."). Indeed, some recent decisions elide "necessity" from the analysis, focusing instead on the practical value and expediency of using quick on-scene show-ups to confirm that the police had arrested the right suspect or to exonerate someone arrested by mistake. *See*, *e.g.*, *United States v. Heard*, 951 F.3d 920, 926 (8th Cir. 2020) ("'Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody' or having a light shone on their face 'do not render the identification procedure impermissibly suggestive.'") (quoting *United States v. House*, 823 F.3d 482, 488 (8th Cir. 2016)); *see also Henderson*, 719 F.2d at 937 n.4 ("The need for quick and efficient police investigations and arrests, and the desire to release persons mistakenly apprehended, may offer some justification for a showup.") (citations omitted) (collecting cases). But here, the Court needs to decide neither whether the suggestive procedure employed was sufficiently necessary to obviate further analysis, nor whether controlling current jurisprudence still requires such necessity. As the court did in *United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008) (involving a show-up identification of a suspected bank robber outside of the recently robbed bank while handcuffed and surrounded by police), the Court will assume without deciding that the

suggestive procedures used in this case were unnecessary, and will address the reliability

of the identifications at issue. And there can be no doubt that the identifications are all

sufficiently reliable as to preclude suppression.

### B. Reliability

"[S]uggestive procedures, without more, do not require a holding that the due

process clause has been violated." *Hadley*, 671 F.2d at 1115 (citing *Brathwaite*, 432 U.S.

at 114). "[T]he [identification] will be admissible as long as it is not impermissibly

suggestive *and* unreliable." *United States v. Heard*, 951 F.3d 920, 925 (8th Cir. 2020)

(quoting *United States v. Mitchell*, 726 Fed App'x 498, 501 (8th Cir. 2018)). "[R]eliability

is the linchpin in determining the admissibility of identification testimony," and the Court

must consider the factors set forth in *Neil v. Biggers*. *Brathwaite*, 432 U.S. at 114. These

factors are:

> (1) the witness's opportunity to view the criminal at the time of the crime,
> (2) the witness's degree of attention, (3) the accuracy of the witness's prior
> description of the criminal, (4) the witness's level of certainty at the
> confrontation, and (5) the length of time between the crime and the
> confrontation.

*United States v. Shumpert*, 889 F.3d 488, 491 (8th Cir. 2018) (citing *Biggers*, 409 U.S. at

199–200). These factors are at times mutually reinforcing and at times redundant, so the

Court considers the totality of the circumstances for the identifications in this case.

When the Court applies this analytical framework to Mr. Rulford's case, it becomes

clear that each of the four identifications was more than sufficiently reliable to overcome

due process concerns.  Although Mr. Rulford valiantly endeavored to characterize each

witness's perceptions and recollections as flawed, the record actually reflects that the

witnesses in this case provided descriptions that are remarkable for their consistency and accuracy when compared both to the video and to Mr. Rulford. Although Mr. Rulford should certainly highlight the inconsistencies explored in his brief during cross-examination at trial, they do not support suppression.

### Opportunity to View the Suspect and Degree of Attention

For all four witnesses, the nature of their interactions with the man in question elevated the attention they paid from that given to someone with whom they have no contact, such as a passerby or a fellow customer in a store. The interpersonal interactions between each witness and the suspect increased both the opportunity for them to view the suspect and the likelihood that they paid attention while doing so.

L.M. and L.W. were able to view the suspect on two occasions: first when they encountered him at the Pump N Munch, then again during the shooting. Video shows L.M. getting out of the car and talking to the suspect for at least a minute while just feet apart. The gas station was brightly lit, and there were no obstacles between L.M. and the suspect. And L.M. was surely focused on the suspect, who was angry and may have been arguing. L.W.'s view at the time was more obscured, as the car was facing away from the suspect and it is unclear whether her view from the front passenger seat was obstructed even if she turned her head. However, the suspect later moved closer to the Pump N Munch, in clear view of the passenger window, and L.W.'s statements to Officer Wick demonstrate she was focused on the ongoing argument and had an opportunity to view the suspect. And later, when the suspect approached L.M. and L.W. with a gun and shot at them, he certainly

would have had their full attention, at least at first, particularly in light of the earlier encounter.

I.P. and H.R. also had a good opportunity to view the suspect and paid attention during their encounter. They told Sgt. Soliday that the suspect knocked on their car window and they had a brief conversation. While driving away, they saw the suspect abandon several items in a bush, which police later found, confirming their narrative. The suspect's face was just feet from their own, and the fact that they were able to accurately point to the suspect's hidden, abandoned clothing strongly supports that they could and did focus on him during and after their encounter.

### Accuracy of the Prior Descriptions

This factor also weighs strongly in favor of a finding that the identifications at issue were accurate. Mr. Rulford was found wearing jeans, a white t-shirt, a blue bandana, and dreads. Police also found a dark, and uniquely patterned sweatshirt matching the one in the gas station video. Based on its review of the record here, the Court finds a high degree of correlation between the various witness descriptions, Mr. Rulford after his arrest combined with the discarded clothing, and the Pump N Much video.

L.W. first described the suspect as wearing jeans, a white t-shirt, dark zippered jacket, and a hat. Her second description did not significantly change, repeating what she said in her first description, adding only that the suspect had dreads and his clothes were baggy. L.W.'s description matches Mr. Rulford aside from the zipper on the jacket.

L.M. described the suspect as having dreads, a white beanie or hair-wrap, and a "TC" tattoo on his right cheek. Although he provided only a vague description of the

suspect's clothing, it proved accurate. As Officer Wick's comments point out, a "TC" face tattoo is not unique to Mr. Rulford, but the fact that L.M. was able to specifically identify both the tattoo and its placement on the suspect's face credits his accuracy. And even if it is common enough that an officer in this case could name another person with similar ink, it is certainly rare enough to find such a tattoo on someone's face as to support an identification.

I.P. and H.R. described the suspect as a tall black male with dreads, wearing a hoodie, a black shirt, and a white shirt underneath. This also proved to be an accurate description, matching the video evidence from the gas station. Even more conclusively, they were able to point to exactly where the suspect had abandoned several items. The only incorrect aspect of their description was H.R.'s statement that the suspect was wearing a white hoodie rather than black, but as noted, it is possible H.R. was accurately referring to the headwear seen in the video. And there is no requirement that the identification be perfect in all respects for it to be sufficiently reliable for admissibility. *See Biggers*, 409 U.S. at 200 ("Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough."); *United States v. Henderson*, 719 F.2d 934, 938 (8th Cir. 1983) (finding that the witness's identification of Henderson was reliable though the witness "overestimated Henderson's height by 2-4 inches, his weight by 25-35 pounds, … underestimated his age by 4-8 years," and "fail[ed] to mention Henderson's moustache and beard in both descriptions to the police").

### Witness' Level of Certainty

Although this factor is less persuasive than many, the witnesses' expressed certainty that Mr. Rulford was the person they had seen just hours earlier also weighs against finding a due process violation in this case. During the confrontation, L.M. said Mr. Rulford's dreads, tattoo, and—most distinctively—his pants, all indicated it was the same person. When Officer Wick asked, in a series of rapid-fire questions, if it was "For sure him?" L.M. responded, "Uh…," before being quickly interrupted with "That's him?" L.M. then said, "Yeah," and when asked again, "For sure?" this time said, "Yeah." (Gov't Ex. 6c at 1:56:09–1:57:14). Verbally, L.M. expressed a high level of certainty when pressed by Officer Wick. Nonverbally, his tone indicated some hesitation, but he seemed generally confident in his identification.

After first seeing Mr. Rulford, L.W. said, "that looks like him." When asked how sure she was, she responded, "Um pretty certain," and when asked for a percentage, said, "Um like 90% sure." When asked to identify any specific characteristics that seem familiar, she noted "His facial structure and his hair," but also said, "I can't really see [it or at] all … Does he have something on his face? … I remember seeing something there on his face." Finally, when asked, "Are you certain?" she told Officer Wick, "Yeah." (Gov't Ex. 6c at 2:02:44–2:03:46). Her tone and statements indicate a realistic but small degree of doubt, but she ultimately stated she believed that Mr. Rulford was the suspect both before and after questioning.

Immediately after arriving in the parking lot, I.P. said, "Yep that's him." When asked how certain, she said, "Umm, I'm 100% sure." When asked how she was sure, she

said it was based largely on "the dreadlocks and the white shirt." (Gov't Ex. 6c at 2:19:03–2:19:45). There is no doubt that I.P. was certain Mr. Rulford was the person she had seen previously, as indicated through both through her words and her tone.

Finally, before the car even stopped, H.R. said, "Yep that's the guy." When Officer Wick asked, "Are you very certain?" he responded, "Yeah." Quickly following up, Officer Wick asked, "100%?" to which H.R. again says, "Yeah." When asked, "What makes you know it's him?" he said, "I know that's the guy." H.R. also referenced the shirt as being the clearest sign of it being the same person, and H.R.'s overall demeanor was confident in unequivocally stating it was "100%" the right person. (Gov't Ex. 6c at 2:27:35–2:28:30). While not able to point to many specific identifiers, H.R. too expressed absolute certainty Mr. Rulford was the suspect he had seen earlier.

### Length of Time Between the Crime and the Confrontation

Finally, for all the witnesses, the time between the crime and confrontation was quite brief. Both the government and Mr. Rulford describe the time as being about two hours. (Gov't Br. at 24; Def. Br. at 21–22). This weighs heavily in favor of reliability. Although Mr. Rulford argues a significant amount of time passed between the crime and the identifications, it is very hard to conclude that a period of only two hours weighs against reliability, especially when many identifications take place after days, weeks, months, or in some cases, even years. *See Sanchell*, 530 F.2d at 295 (finding a witness unreliable partially because her identification was a full year after the crime). Two hours is very little time at all, and weighs against any suggestion that these positive identifications were the product of undue suggestion.

**Totality of the Circumstances**

Overall, the Court considers the totality of the circumstances regarding reliability and weighs them against the suggestiveness of the show-ups. Here, the Court readily concludes that the identifications were sufficiently reliable and their admission would not violate Mr. Rulford's due process rights. Each witness had sufficient opportunity to view the suspect, either in the gas station or outside their car, and each was paying attention to the suspect. Their descriptions were remarkably accurate, with minute mistakes, like the presence of a zipper on a sweatshirt. All four expressed a high level of confidence in identifying Mr. Rulford, a degree of certainty that was credible in light of the circumstances. And the time between them first encountering the suspect and identifying Mr. Rulford was quite brief.

In determining whether Mr. Rulford's due process rights would be violated by the admission of these identifications, the Court is not limited strictly to the *Biggers* factors. *Graham*, 728 F.2d at 1546 (observing that "it is difficult to ignore additional facts which indicate that the actual likelihood of misidentification in this case was slim"). An additional circumstance that the Court considers here is the remarkably thorough video and audio record that both the Court and, if necessary, a jury can view. A fact-finder will be able to look at the suspect from the Pump N Munch, look at the images of Mr. Rulford on the night in question, listen to each description and each identification, and asses the validity of these identifications for themselves. Although the *Biggers* factors are a useful tool of analysis, the ultimate question remains whether there exists "a very substantial likelihood of *irreparable* misidentification." *Biggers*, 409 U.S. at 198 (emphasis added). If needed, the

jury will also be able to consider the suggestiveness of the circumstances for themselves, as all of the interactions between the officers and the witnesses are likewise captured on video. This reality means that counsel for Mr. Rulford will be able to highlight any flaws in each identification, significantly mitigating any due process concerns. Any potential misidentification may be much more readily identified by the jury, significantly reducing the chances of it being "irreparable."

Looking at the totality of the circumstances, although the show-ups were certainly suggestive, each witness had a sufficiently independent basis for being able to identify Mr. Rulford. The bar for suppression is a high one, and it has not been met here. The Court recommends the Motion to Suppress the identifications be denied.

## RECOMMENDATION

Based on the foregoing, the Court recommends that Mr. Rulford's Motion to Suppress Eyewitness Identifications (ECF No. 31) be **DENIED**.

Date: August 20, 2021

  *s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR

72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.